Mr. Scott, we'll be happy to hear from you. Good morning, your honors. May it please the court, my name is Robert Scott. I'm an assistant attorney general for the state of Maryland. I'm here today representing Tyrone Crowder, who is a former warden of a correctional facility in Baltimore known as the Maryland Reception, Diagnostic, and Classification Center. We're here today to ask you to reverse a judgment in the amount of $700,000 that was entered against Mr. Crowder personally, based on the actions of three other correctional officers at the facility. The judgment was entered against Mr. Crowder based on the unprecedented and unforeseen attack on several inmates by these three subordinate correctional officers. The judgment was entered against Mr. Crowder even though it is undisputed that he did not participate in this attack. In fact, he was not even present in the building when it took place. There was no evidence presented at trial that Mr. Crowder approved the attack or had any advanced knowledge of it. The evidence shows that Mr. Crowder did not find out about the attack until well after it took place. Can you help me with, you said there's no evidence in the record that he approved of it. And there is testimony about some people thinking he was at roll call and that he said, why do my officers look like this and my prisoners look like that? There seems to be, this record is replete with disputed evidence. There seems to be a dispute about whether he was at roll call, whether he wasn't. A lot of officers thought he wasn't. Somebody thought he was. What do I do with that? There's no testimony that indicates that he was present at roll call. I read it, there was. So what do I do with that? Okay, which witness are you referring to, Your Honor? It was in the trial. I don't have it in front of me. That's something you should be telling me, but thank you for the question. Well, Mr. Hanna testified that he was not present. Can I ask it differently? If there was such testimony, do you lose? Well, it would depend on what he said, Your Honor, but I don't believe there's any testimony indicating that Warden Crowder at that morning roll call said anything. There were allegations that he was at roll call initially. In fact, if you read the initial complaint before the amended complaint, the allegation was just as Your Honor just described, that he held up photographs of the officer who had been attacked the previous night. But when you get right down to the trial testimony. Why don't you look at JA 1107? And this is the testimony of Officer Hanna, who testified that Crowder spoke at the roll call for the night shift following the assault and asked, quote, why do my inmates look like this and my officer looks like that? End quote. Right, and he subsequently asked, do you have any personal knowledge of whether Warden Crowder was at the roll call? No, I do not. Right, he says he heard it from other people. Correct. Again, that's 1107 crossover to 1108. Right. Again, Your Honor, he wasn't there. He testified that he was not present at the roll call. Was that stricken? Could the jury consider that  It was not stricken, Your Honor. So the jury could consider that? Yes, Your Honor. The jury could consider that evidence. It was not stricken, that's correct. Right. Right. But that does not indicate that he had advanced knowledge of this attack. But you said that there's no evidence that he condoned it. No, that he approved it in advance, correct. You take that not as approval? I mean, let's hypothesize that we have a video of Officer Crowder at roll call for the night shift following the assault. And in it, he says, hey, officers, in his best Jack Nicholson voice, why do my inmates look like this and my officers look like that? And you think if that was on video and we knew he said it, that that wouldn't be condoning and or ordering implicitly the attack? Well, we don't have that video. I'm asking the hypothetical. Your Honor, if that had happened in this case, we'd have a different case. And I'm asking, if that happened in the case, do you agree that you would lose? I would agree that someone could conclude that if he says it in that menacing voice and there's a video of it, that he knew in advance. What about if he said it in a sing-songy voice? Do you really think that that's the determining factor? I think the video, I mean, we don't have a video here. What we have is we have testimony from somebody who wasn't at roll call about what happened at the roll call based on what somebody else said who's not identified. And I'll ask one last time, and then I'll just take your refusal to answer as acquiescence, is that if he said that, do you agree you lose? No, Your Honor. Mr. Scott, let me ask you. I know the IIU investigation wasn't always flattering to Warden Crowder, but I do think they found that he did not have advance evidence of the risk of retaliation or the retaliatory attack. Am I correct in that? That's correct, Your Honor. Detective Sage's report, which was offered in evidence by the plaintiff, concluded that he did not. And the report takes fault with Mr. Crowder for certain things he did after the assault, not responding quickly enough, not investigating quickly enough, and takes fault with the fact that Mr. Crowder didn't transfer these inmates out of the institution immediately. But it does not say, in fact, it does not conclude that he had advanced knowledge of this attack, and no witness with personal knowledge of what took place testified that Warden Crowder knew about this. And it's an important point, isn't it, as we try to figure out what this clearly established set of conduct that should have put him on notice that he was not acting properly or violating constitutional rights here. As near as I can tell, what the plaintiff's argument comes down to with respect to our qualified immunity defense is that there was a clearly established right by Mr. Younger to be transferred out of MRDCC that night to another facility. And Detective Sage, who conducted his investigation of Warden Crowder, admitted in his report, acknowledged in his testimony, that there was no written protocol requiring that these inmates be transferred out that evening. In fact, Ms. Hinton said, excuse me, Ms. Hinton actually said that his response was reasonable. And expert witness for Mr. Younger, I think Mr. Leach said his response was reasonable in not transferring. That's exactly right. So no advance notice of this potential for retaliatory attack. And response was reasonable. Correct. You're right. That's right, Your Honor. I mean, the most that was shown here was that Warden Crowder was perhaps negligent after the fact and not- Do we have to accept those things? So I understand that, you know, there's an officer who says he acted reasonably, but we've got a verdict that says he didn't, right? I mean, so I have a little hard time understanding, given the posture we've got, we've got to take the evidence as found by the jury. And if the jury believed all of the things that the officers here testified about how reasonable Crowder acted, they couldn't have convicted him, right? So don't we have to assume that they were not accepted by the jury? Well, Your Honor, he wasn't convicted. He was found- I mean, I'm sorry, former prosecutor, my apologies. He was found deliberately indifferent to a substantial risk of a retaliatory attack taking place against Mr. Younger and other inmates. And this is an incident, all the witnesses who testified who worked at the facility said that this attack was unprecedented. Nothing like this had ever happened where you had an attack, a pre-planned retaliatory attack taking place the next day. And I understand you have  but isn't that all about sufficiency of the evidence? If we disagree with you on sufficiency of the evidence, don't we have to forget all that stuff and accept that your client was deliberately indifferent to the serious risk of the attack? I mean, that's what the finding was. Now, I understand you got a sufficiency argument, but if we get past sufficiency to qualified immunity, we can't re-litigate sufficiency, right? We have to say your client was deliberately indifferent. Right, but then the question becomes, Your Honor, what's the clearly established right that vitiates the qualified immunity here? And there isn't one. I mean, there's no constitutional right to be transferred out of a prison that night in an emergency fashion. I mean, the inmates who were involved in this incident were put in segregation. That's what the warden knew that evening. That's what he was told. And he made his decision based on that. So what's the clearly established right that was purportedly violated here? And if there isn't one, then Warren Carter's entitled to qualified immunity. How does the appellee describe the right, define the right? It's unclear to me, Your Honor, when I read their brief. I mean, I think they basically, they say he shouldn't have been attacked. I mean, nobody's disputing that Kevin Younger shouldn't have been attacked. That's not our argument. The argument is, what was the clearly established right that was purportedly violated here? That's what they need to overcome. Maybe again, another hypothetical, and I accept they're hypotheticals, okay? But if I read Slakin and Shaw to establish a right that sounds something like a supervisor who's aware of a serious risk of attack by his supervisees, but does nothing, violates the victim's constitutional rights, except that I say that, I understand you disagree with it, but except that, do you think that would be met here if that was a clearly established right? And if I accept that there was sufficient evidence to find your client deliberately indifferent, doesn't, would that be sufficient? I understand you're gonna fight the premise, but come back to that in amendment. Well, your Honor, I guess I won't even fight the premise. I'll just say the evidence here isn't that Warren Carter did nothing. I mean, that's their argument, but that's not what the record shows. He was- Okay, but how do I understand the finding that he was deliberately indifferent, right? That is, he knew of a high likelihood of the attack and did nothing. That's what they would have to have found to find him, not guilty, I apologize, but to hold him responsible in a civil sense. Yes, except there also has to be a causal connection between the deliberate indifference and the injury. That's right, and the jury found that. And so we have to assume it happened, right? I mean, at this stage, I get that, right? I'm trying to isolate the qualified immediate. Is there sufficient evidence for the jury to find that? And it's our argument that there was not because Warren Carter was told and confirmed with his staff that these inmates who were involved in this attack were put in segregation that night. And he was told that the officer was doing a report and was gonna go to the walk-in medical clinic. And based on that, he made a decision not to transfer the inmates out until the next day. So, and- So do you agree that your qualified immunity ultimately just turns on your sufficiency of the evidence claim? I mean, I tried to ask it as a hypothetical, but you wanna argue the sufficiency of the evidence, which is fine, but do you have an argument that is separate from the sufficiency of the evidence, or do I just, at that point, say, if you lose on sufficiency, do you also lose on qualified immunity? Yes, you are. That's what I'm trying to get to. Our argument is that this is not a, that there's not a clearly established right that was violated by the refusal to transfer, the failure, rather, to transfer the inmates out that evening. Okay, can you take, well, I'll come back to you. Thank you very much, Mr. Scott. Mr. Honick? Honick. Honick. Thank you. Thank you, we're happy to hear from you. Thank you. Good morning, and may it please the court. Alan Honick on behalf of the appellee, Kevin Younger. This court should affirm the jury verdict below and the judgment that was entered, and leave that verdict undisturbed. Importantly, we're here on a sufficiency challenge, not on a Rule 59 challenge. And so assessments of the credibility and the weight of the evidence are not for today. And what we heard just a moment ago, our closing arguments restated. Arguments about belief, arguments about weight, arguments about quality of the testimony. Judge Rushing, I believe you commented early on that this record is replete with disputed facts. I would submit to this court that every fact, material and otherwise, was in dispute for this jury. Because every fact was in dispute for this jury, summary judgment was denied, and the jury was asked the ultimate question to which it responded, Mr. Crowder was deliberately indifferent or criminally reckless to the known risk of malicious attacks by his subordinate officers to prisoners at MRDCC like the plaintiff. This case is not about an emergency transfer. The emergency transfer was the final nail in a four-year chain of notice events to which Mr. Crowder refused to respond. And to be very clear, if it didn't come across in the letters of our brief, the right to be free from malicious attacks by correctional officers was a clearly established right as this court said in Thompson versus Virginia, which is a 2017 case, but this court in that case said that that was a clearly established right since 2010. But the warden isn't Green or Ramsey or Hannah, right? Of course not. What notice did Warden Crowder have regarding this established right that you're talking about as it would apply to the warden in supervisory liability? Yes, Judge Leiden. And so there are two tranches of notice, if you will, that we presented to the jury as far as the warden himself goes. There are the four years from 2009 to September 29th, 2013, to the day of the correctional officer attack, the Ganayu incident. In those four years, we presented to the jury eight distinct notice events brought to Mr. Crowder by various supervisors, subordinate supervisors and superior supervisors. And over the course of those four years, Mr. Crowder's staff came to him and said, you've got a problem here. You've got a general problem, a systemic problem, a culture problem where people around here don't like to do their jobs correctly. Supervisors don't like to supervise. Staff do whatever they want with impunity without fear of consequence because nobody gets disciplined or at least discipline is put on hold around here because this was a lawless prison environment. And we didn't impose a divining obligation onto Mr. Crowder. In other words, we did not suggest that Mr. Crowder should have read between the lines, should have been reviewing documents and come to these conclusions himself. Beginning in 2009, when Mr. Crowder was assistant warden, his warden who testified at trial, Miss Hinton, said, I noticed a problem with Officer Green. But that's interesting that she noticed that before this ever happened, but yet when Crowder calls her after finding out about the attack on the correctional officer, she doesn't bring that up. She doesn't suggest a transfer and she finds his response reasonable. I'm glad that you brought that up, Judge Leiden, because if you read the transcript about that alleged phone call, I can point you directly to it. It's at Joint Appendix 1815, right around that part. The jury was free to disbelieve Mr. Crowder about ever making that phone call to begin with, because what Miss Hinton said is, I don't recall ever talking, I for sure never had a conversation with Mr. Crowder on the night of the Ganiyu incident about a transfer. Of that, I'm certain. And I don't even recall ever talking to Mr. Crowder about the Ganiyu incident on the night that it happened. The jury was free to, and that's the whole point, Your Honor. This is not a Rule 59 challenge. This is not a who's right or who's wrong. This is, was there evidence for a jury to reasonably conclude in its exclusive fact-finding province that one side was right and one side was wrong? And that's what happened here. And that's the only thing that this court can review. She doesn't, you don't, she doesn't change her testimony though regarding, or she does indicate that his response was reasonable. She indicates his response was reasonable based on the question posed to her of, if this was all of the information that Mr. Crowder was provided with on the evening that Ganiyu was attacked. And to be clear about what that information was that Mr. Crowder said, the only thing I knew that night was that Officer Ganiyu had a bump on his head and a scratch on his lip. So Ms. Hinton said, if that's all that he received, and you mentioned to my colleague also, our expert, Mr. Leach, made the same comment. It was reasonable. If that was all that Crowder heard, then his response was reasonable. I have to go back for just a minute to the argument that precedes us. And Judge Richardson, you brought up to counsel that when a statement contains an if, the jury resolves the if. Because here with Ms. Hinton and with Mr. Leach, if Crowder heard bump on the lip and cut on the head, then his response was reasonable. But a jury is free to disbelieve that. And if it's not- Do you think it's true, if the jury did believe that, could they find him deliberately indifferent? If all that we had was the Ganiyu incident, perhaps. But we have four years. That predate- Perhaps. Which way? I'm sorry. Well, to answer your question, Your Honor, if- I said, could a jury find if that's all the information that Crowder had? Maybe I'm not, which direction? I'm sorry, go ahead. If a jury found, a jury could reasonably find as to his response to receiving information about Ganiyu having a cut on his head and a bump, or a bump on his head and a cut on his lip, that his response, if that's what he heard, was reasonable. Of course, that's within the province of the jury. And the jury could equally reasonably conclude the opposite, which they did. So I thought you would be stronger about that. I thought you'd say, if all we had was this one incident, so if there were no prior incidents, then not only could a jury not find him liable, but a judge would grant summary judgment. Because if it's only a single incident and it was a bump on the head, that that, like standing alone, wouldn't be sufficient. The problem is that's not what we have. Certainly, Your Honor, and that's where I was going. A hundred percent, and this was the strategy at trial too, when you take these notice facts in isolation and put a silo around them and present them to the jury as if they existed in an echo chamber, perhaps what Your Honor just suggested is correct. That if all we had was Ganiyu, the Ganiyu incident in Mr. Prowder hearing, it was a minor, not a big deal, then it would probably be error as a matter of law to deny a Rule 50 motion. I would agree with you there. I would state it as follows, Your Honor. If the Ganiyu incident never happened and all we had was four years of repeated, explicit notice about the same correctional officers maliciously attacking prisoners at MRDCC, Judge Bennett correctly would have denied the Rule 50 motion on those facts. And so you can remove, for the purposes of your review, the Ganiyu incident in its entirety. Can, let's imagine that you have the very facts that are at issue here, like everything that's happened. And Crowder, upon hearing this, immediately issues a order that these inmates are not to be touched. Would that have sufficed? I'm trying to figure out what you think. One thing they could have done is they could have said, all they had to do is transferring. But another thing, in theory, they could do is order that they not be touched. Sure, an admonishment, aside from being reasonable correctional practice, as the jury heard, certainly would have weighed in favor of a finding toward Mr. Crowder. That's correct. However, what we have here is not just no admonishment, not just going to bed that night as if nothing happened. Mr. Crowder made a specific order despite a department regulation to the contrary that says thou shalt immediately transfer when this type of an assault happens on a correctional officer. And in fact, the violation of that regulation was the basis for the disciplinary action against Mr. Crowder that led to his ultimate demotion. Let me ask you, was it the assistant warden that told Mr. Crowder that night what happened? No, Your Honor, it was a captain by the name of Ms. Boyd White from the MRDC facility who called Mr. Crowder the record evidence showed within 10 minutes after the Gnaju attack. Okay, am I correct that the assistant warden, when he was told about it, thought it was not a major incident either, or thought there were minor injuries, or as you put it, bump on the head sort of type situation? Wasn't that the assistant warden's testimony? The assistant warden testified that that's what Crowder told her. What the assistant warden told the jury, and it's cited in our papers, and it's well-established in the record, and this is why all of the facts are in dispute, but what the assistant warden said is that the captain makes a phone call from MRDCC to Crowder. Bypassing her, she should have heard first, but for whatever reason, they call Crowder, and what Crowder told the assistant warden was I just heard it was a minor thing. What the captain told the assistant warden was I told him that Ghanayu was, quote, in bad shape. Okay, got it, thank you. And so a jury, as I said before, it's only for the jury to resolve these weight issues, these believability issues. Going back to the notice. Can you talk for a second about Judge Rushing's question from earlier, this testimony about Officer Hanna, just sort of the hearsay that maybe Crowder was at roll call and said, you know, why do the inmates look this way? The record evidence seems pretty strong that he was not at roll call that night, and yet it's in the record. There's no hearsay objection. It was never struck. What do I do with that, and can I rely on that, or should I not rely on it, given the overwhelming evidence that he was not at roll call, right? It seems a little hard to believe. I would suggest to you, Your Honor, that as I suggested to the jury, that that's not a fact that's necessary to find that Crowder had either advanced knowledge of a pervasive risk of harm or that his response was inadequate. The bottom line is that we presented many pieces of evidence that preceded the assault and that followed the subject assault that show MO, that show mannerism, that show habit and practice, and that the way in which Mr. Crowder responded or chose to ignore glaringly obvious notice facts was present far before and far since the subject attack, and those things, again, helped the jury to resolve credibility issues and believability issues. When Mr. Crowder presented a picture that according to him and from his vantage point, he never had an issue, that was his testimony, I never had an issue at MRDCC. Well, the jury was presented with that picture on the one hand and the picture from 12 supervisors who testified in open court to the contrary of Mr. Crowder on the other hand, and it was up to the jury to decide because all of Mr. Crowder's supervisors in real time noticed and appreciated the pervasive risk of harm. We don't have to imagine that. They- What did those supervisors say about whether this was an unprecedented attack? As far as the subject assault on the prisoners, it was unprecedented. Yes, many of them said it was unprecedented, but unprecedented doesn't fall into the supervisory liability calculus, but the supervisory liability, nor does motive, by the way, but what the supervisory liability calculus asks is was there knowledge of a pervasive risk of harm? Here, the pervasive risk of harm were malicious attacks by correctional officers against the prisoner population. There was express, repeated actual knowledge and notice given to Mr. Crowder by all of the people around him. And Mr. Crowder's response- What did you interpret the reference to unprecedented to mean? I mean, because you could read unprecedented in a couple of different ways there. So when they're saying the attack on the inmates was unprecedented, how should we understand that? Yes, Judge Richardson, that is an attempt to raise the standard for supervisory liability and specifically for the notice required for supervisory liability to attach to something far beyond what Farmer and Shaw and its progeny have ever contemplated. Namely, that in order to have notice of some type of risk of harm, you have to know that it was a premeditated, retaliatory, concerted, coordinated, conspiratorial attack. If that was the standard, the Supreme Court would tell that to us. Rather, what the Supreme Court says is that it's a pervasive risk of harm that's fact-dependent and that's circumstance-dependent because what's unreasonable or what might cause those notice facts to rise to the level of constitutionally problematic in one instance may not in the next. And it seems to be, it seems to, I don't think there's a dispute that it was unprecedented to have a retaliatory attack. People said, well, actually there may have been one witness who said there were lots of those, sorry. But by and large, the witnesses say they were unaware of a pattern of retaliatory attacks or vigilante justice. Now, they were aware that officers were beating up, you know, detainees, but not for retaliation. If that were the case, does that still meet the standard of sufficient knowledge? It certainly does, Your Honor. And I would point this court back to its decision in the Thompson case in 2017, where it says in no uncertain terms, prisoners have a right to be free from malicious attacks, not only by other inmates, but by the very supervisors who jailed them. That's what, and this court did not expand or articulate anything beyond what I just quoted. That's the standard. That's what Judge Bennett applied below. He did so correctly because all of the facts are in dispute. He asked the question, which is what Rule 50 requires, can reasonable minds look at the same evidence and differ? Your Honors, we have to look no further than the procedural posture in which we stand here before you today. We have the Maryland Office of the Attorney General, who has been in this case representing Mr. Crowder since day one. They've looked at the evidence presented, and they come to one conclusion. We have a properly instructed jury, and we have Judge Bennett, a seasoned judge in the District of Maryland. On the other hand, he looked at the same evidence and concluded the opposite. By definition, Rule 50 has to be denied because reasonable minds differ. And unless there are further questions, Your Honors, I would ask that you affirm the judgment below. And because the jury found Mr. Crowder to be deliberately indifferent, this court's decision in the Granado case in 2020 disposes of qualified immunity because in Granado, this court held that when an individual acts maliciously or recklessly in violating somebody's fundamental rights, that person forfeits his or her right to qualified immunity, which is what happened here. Thank you, Your Honors. Mr. Scott, we'll be happy to hear from you. Thank you, Your Honor. I just want to address a couple of things. Counsel says that there were 12 supervisors who purportedly testified that there was a pervasive risk of harm in this institution. That's not correct. There were not 12 supervisors who testified to that. In fact, the witnesses that they were relying on said things that were very different than that. Assistant Warden Fisher, they put her on the stand and she testified about a time when she had expressed a concern to Warren Crowder that Green and Ramsey were appearing in use-of-force reports. And this is held out somehow as evidence that the warden knew these guys were using excessive force. That's not right. A use-of-force report is a report that's required to be filed anytime a correctional officer has to use force on an inmate. This is a correctional institution. Using force on inmates is sometimes required to do the job. And the regulations are when you do that, you have to fill out a form. That doesn't mean there's excessive force. But Crowder was reviewing those, right? And so he would see those same names coming up. It was part of his responsibility to review those reports, absolutely. But there's no evidence that any of those use-of-force reports said anything about Green and Ramsey using excessive force. Those reports were not put in evidence. Their expert did not make any assessment of those reports. It's just innuendo. Oh, there were these use-of-force reports that Green and Ramsey appeared in, and therefore they must be bad guys and the warden should have known. Well, even if, let's take it a step farther. Let's say they're right and the warden, what was he gonna do? He knows that Green and Ramsey are appearing in use-of-force reports. If it's not a documented violation, there's nothing the warden can do. The testimony at the trial was clear. Once there's an investigation commenced into an allegation by an inmate of excessive force by IIU, which is the Internal Investigations Unit, the warden is no longer involved. And he can't take any disciplinary action until that investigation is concluded. And that investigation has to be concluded within 90 days. Otherwise, the officer can't be disciplined. So their theory seems to be, based on uninvestigated claims by inmates, that the warden was supposed to do something to prevent these guys from working in the institution. Well, the testimony was clear. The warden can't transfer them out of the institution. He could put them at the front desk, at the metal detector, or the control center. But he has the power to do that. But if the warden were gonna reassign a correctional officer every time an inmate made a complaint about that officer, the warden's not gonna be able to run the institution. The other thing I wanted to- Can you talk about Hannah's testimony in that same context? Yes, Hannah's testimony made clear that none of the information he was conveying was known to Warden Crowder. He never talked to Crowder. He never reported any of this alleged conduct to Crowder. As high as it went, according to Hannah's own testimony, was Lieutenant Singletary. He claims that Singletary knew about this stuff that he claimed he was doing, which was obviously a violation of the protocols and such. But there's nothing to tie it to Warden Crowder. In fact, he says, Hannah says, well, I was told not to write reports. Well, if that's true, that explains why Warden Crowder didn't know about it because he was engaging in this conduct and then not doing reports. There's nothing to tie any of that to Crowder. And all the other employees who worked there testified that there was no such vigilante culture at the prison. He's the only, Hannah is the only person who made that allegation. Hannah did have really, really strong things to say. Did he cooperate against Ramsey and Green in their criminal case? I believe he was a witness for, yes, Your Honor, yes. Okay, that's not something you just readily knew, though I was just curious about it. He was a witness in the criminal case, yes. He gave testimony. And all three of them were convicted. He pleaded, Hannah pleaded guilty. Was his plea agreement part of any sort of impeachment or any, was that discussed in the- I mean, I asked him on crossings, he admitted he was, that he had convicted. I just wonder if he got any sort of credit for cooperating. I don't know the details of the plea agreement. It's sort of a prosecutor question. I think he got, I think he ended up with a, he had to fill some conditions and then ended up with a PBJ if he did. But I don't know how that all came out. Can I ask you one question about exhaustion? That we haven't talked about, but I think we haven't talked about it for good reason. I just want to confirm that my understanding is correct. Crowder's post-trial Rule 50B motion did not mention exhaustion, right? The written renewed motion did not, Your Honor. The motion that was made at, verbal motion that was made at the conclusion of all evidence, incorporated by reference, the summary judgment motion, which had been filed, which did raise exhaustion. But the post-trial, post-verdict 50B didn't. No, it did not. It did not. The other thing I wanted to point out was we also heard from counsel that there was this clearly established protocol that the inmates were supposed to be transferred out that evening. Detective Sage testified, this is at JA 993, that there was no such protocol in place at this time. So their own witness testified that this protocol did not exist. And so therefore, there's no clearly established right to be transferred from the facility that night. Warren Crowder took what he thought to be reasonable steps based on what he knew, which was there were two inmates involved in this assault, no weapons reused, and the inmates had been placed in segregation. And with that, unless the court has any other questions, I think I'll simply ask that the court reverse and vacate the judgment entered in favor of Mr. Younger against Mr. Crowder. Thank you. Thank you, counsel. As you now know well, having listened to three of these, we wish we could come down and shake your hands and thank you. It's a tradition that we value a great deal for the civility and engagement with our bar, and we hope to do it soon. And we'll hope to see you back to be able to do it with you.
judges: Julius N. Richardson, Allison J. Rushing, Sherri A. Lydon